IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

GROTTOES PALLET )
COMPANY, INC. )
)
Plaintiff, )            Case No. 5:15-cv-00017
)
v. )
)            By:    Michael F. Urbanski
GRAHAM PACKAGING )                   United States District Judge
PLASTIC PRODUCTS, INC., )
)
Defendant. )

## MEMORANDUM OPINION

This case is a contract dispute involving ant-infested wooden pallets. Plaintiff Grottoes

Pallet Company ("Grottoes") manufactures wooden shipping pallets sold to defendant Graham

Packaging Plastic Products ("Graham"). Following a dispute over outstanding invoices, Grottoes

filed suit for breach of contract in the Circuit Court for Rockingham County, Virginia on February

3, 2015. Graham claims no money is due because Grottoes provided pallets infested with ants.

Graham also filed several counterclaims, alleging breach of contract, breach of the implied warranty

of merchantability, and breach of the implied warranty of fitness for a particular purpose. Graham

removed the case to federal court on March 9, 2015.

Before the court are Grottoes' motion for summary judgment on Graham's counterclaims

and Grottoes' motion to exclude Graham's expert witness, Dr. Marshall White. The matter has

been fully briefed, and the court heard oral argument on October 1, 2015. For the reasons stated

below, the court will **DENY** Grottoes' motion for summary judgment, ECF No. 19, as to the

counterclaims for breach of contract and breach of the implied warranty of merchantability and

**GRANT in part** and **DENY in part** as to the counterclaim for breach of the implied warranty of

fitness for a particular purpose. Further, the court will **GRANT in part** and **DENY in part**
Grottoes' motion to exclude Graham's expert witness, ECF No. 21.

## I.

Grottoes supplied wooden shipping pallets to Graham for many years. Between December
26, 2013 and March 25, 2014, Graham ordered approximately 16,520 pallets from Grottoes. The
vast majority of the pallets bought by Graham were not heat treated. In all, Graham bought 14,840
non heat treated pallets and 1,680 heat treated pallets. Heat treatment removes foreign
contaminants, such as insects, from wood. Heat treated pallets are more expensive.

Graham owns a facility in Harrisonburg, Virginia that manufactures plastic bottles, jars, and
other containers. From this location, Graham used pallets to ship its products to a variety of
customers. Graham kept heat treated and non heat treated pallets in separate stacks at its
manufacturing facility, selecting a pallet type based on the preference of its customers. One such
customer is Unilever, which uses Graham's containers to package Vaseline and other personal
hygiene products from a plant located in Jonesboro, Arkansas. Graham typically ships material
bound for Unilever first to Interchange, a warehousing company, which stores Graham's products
until Unilever requests a new delivery.

Prior to 2014, Graham used only non heat treated pallets to ship its products to Unilever.
Graham received no complaints of ant infestations from Unilever or any other customers before this
time. In early 2014, however, Unilever rejected approximately five shipments from Graham after
Unilever employees discovered ants in the loads. Graham received the first complaint from
Unilever in February 2014, which led both Graham and Interchange to investigate the issue.
Finding no evidence of ants in Graham's manufacturing facility, Interchange's warehouse, or the
trucks used to transport material between these locations, Graham concluded that the ants came
from Grottoes' shipping pallets.

2

After the initial report of an ant infestation, Unilever rejected several additional loads from Graham because of ants. By April 2014, Graham abandoned use of non heat treated pallets and switched to heat treated pallets for all of its shipments. Grottoes delivered a new load of heat treated pallets to Interchange in April, where employees switched Graham's products from the old non heat treated pallets to the new heat treated pallets. Despite the switch to heat treated pallets, Unilever continued to find ants and rejected at least two subsequent shipments from Graham. Graham thereafter obtained pallets from a new supplier and replaced every Grottoes pallet with those of the new pallet supplier. Graham also refused to pay the outstanding balance on nine invoices due Grottoes. Grottoes filed suit for breach of contract, and Graham responded with multiple counterclaims. Only Graham's counterclaims are at issue in the current motion.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non moving party must then come forward and

3

establish the specific material facts in dispute to survive summary judgment. <u>Matsushita Elec. Indus.</u>

<u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and

draws all reasonable inferences in the light most favorable to the non moving party. <u>Glynn</u>, 710

F.3d at 213 (citing <u>Bonds v. Leavitt</u>, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom

that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in [his] favor.'" <u>McAirlaids, Inc. v. Kimberly-Clark</u>

<u>Corp.</u>, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing <u>Tolan v. Cotton</u>, 134

S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

judge . . . ." <u>Anderson</u>, 477 U.S. at 255. However, the non moving party "must set forth specific

facts that go beyond the 'mere existence of a scintilla of evidence.'" <u>Glynn</u>, 710 F.3d at 213 (quoting

<u>Anderson</u>, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient

evidence favoring the non moving party for a jury to return a verdict for that party." <u>Res.</u>

<u>Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 635 (4th Cir. 2005) (quoting <u>Anderson</u>,

477 U.S. at 249). "In other words, to grant summary judgment the Court must determine that no

reasonable jury could find for the non moving party on the evidence before it." <u>Moss v. Parks</u>

<u>Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993) (citing <u>Perini Corp. v. Perini Const., Inc.</u>, 915 F.2d 121, 124

(4th Cir. 1990)).

### III.

Grottoes' summary judgment motion concerns Graham's three counterclaims: (1) breach of

contract; (2) breach of the implied warranty of merchantability; and (3) and breach of the implied

warranty of fitness for a particular purpose. As to the counterclaims for breach of contract and

breach of the implied warranty of merchantability, Grottoes argues that Graham assumed the risk of

4

insect infestation when it ordered less expensive, non heat treated pallets, since Graham knew that non heat treated pallets had a higher risk for insect infestation. In sum, Grottoes argues that Graham got what it paid for under the contract. As to the counterclaim for breach of the implied warranty of fitness for a particular purpose , Grottoes argues that it had no reason to know the particular purpose for which Graham would use its pallets and that Graham did not rely on Grottoes' skill and judgment as a pallet manufacturer when it chose to order non heat treated pallets.

Grottoes also objects to two errata sheets provided by Graham only days before the deadline to file dispositive motions. Grottoes claims that Graham improperly used errata sheets to make substantive changes to the testimony of Graham's Rule 30(b)(6) corporate designee, Bobbie McCleary, and Graham's Quality Control Manager, Jonathan Smith, in an effort to avoid summary judgment. Specifically, Grottoes claims that the errata sheets change testimony relevant to Graham's knowledge about heat treatment and the potential for insect infestation in non heat treated pallets. Grottoes asks this court to ignore these errata sheets for purposes of summary judgment.

## A.

The court will first address the dispute over Graham's errata sheets. Rule 30(e) of the Federal Rules of Civil Procedure states:

> On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which . . . to review the transcript or recording [and] . . . if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e)(1). Courts in the Fourth Circuit uniformly allow deponents to make minor form changes and corrections to transcription errors under Rule 30(e). See, e.g., E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 277 F.R.D. 286, 296 (E.D. Va. 2011); Foutz v. Town of Vinton, Virginia, 211 F.R.D. 293, 294 (W.D. Va. 2002). The question raised here, however, is

5

whether Rule 30(e) allows deponents to make substantive, material changes to their prior testimony by means of an errata sheet.

The Fourth Circuit has not yet defined the scope of Rule 30(e). Moreover, each circuit to address Rule 30(e) has applied a slightly different analysis, making it difficult to discern a universal standard. See, e.g., E.E.O.C. v. Skanska USA Bldg., Inc., 278 F.R.D. 407, 410–11 (W.D. Tenn. 2012) (collecting cases). There are two general lines of cases, often referred to as the "traditional" and "modern" approaches to Rule 30(e). See, e.g., Summerhouse v. HCA Health Servs. of Kansas, 216 F.R.D. 502, 504–05 (D. Kan. 2003); Foutz, 211 F.R.D at 294. The traditional approach interprets Rule 30(e) broadly and allows deponents to make substantive—even contradictory— changes to their prior testimony. Foutz, 211 F.R.D. at 294; Gilliam v. Valmont-Columbia Galvanizing, Inc., No. 3:13-CV-1575, 2015 WL 4429350, at *4 (D.S.C. July 20, 2015). This permissive approach allows deponents to include almost any change in an errata sheet, so long as the deponent meets the procedural requirements of Rule 30(e).[1] However, both versions of the deponent's testimony remain in the record for purposes of cross-examination, and courts may reopen depositions when deponents make material changes to prior testimony. Gilliam, 2015 WL 4429350, at *2.

The modern approach interprets Rule 30(e) more narrowly, and allow only corrections to transcription errors made by the court reporter. D.I. du Pont, 277 F.R.D at 298; see also Trout v. FirstEnergy Generation Corp., 339 F. App'x 560, 565 (6th Cir. 2009). The most common rationale for the modern approach states:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to

---

[1] Grottoes does not allege that Graham failed to comply with the procedural requirements of Rule 30(e), and those requirements are thus not addressed here.

6

> alter what was said under oath. If that were the case, one could
> merely answer the questions with no thought at all then return home
> and plan artful responses. Depositions differ from interrogatories in
> that regard. A deposition is not a take home examination.

Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992). Noting the lack of binding

Fourth Circuit precedent, some district courts in this circuit adopt the traditional approach to Rule

30(e), Foutz, 211 F.R.D. at 294,[2] while others apply the modern approach. E.I. du Pont, 277 F.R.D.

at 298; Wyeth v. Lupin Ltd., 252 F.R.D. 295, 296 (D. Md. 2008).

In this case, some of the proposed changes in the errata sheets for McCleary and Smith are

proper under either approach to Rule 30(e). For example, Smith's errata sheet corrects a last name

from "Osborne" to "McDonaldson," and notes several minor transcription errors. Smith Errata

Sheet, ECF No. 31-2, at 28:18–23; 40:8–9; 62:14–15. However, both errata sheets also propose

substantive, material changes to deposition testimony, especially that of McCleary, Graham's Rule

30(b)(6) corporate designee. These changes are more problematic.

For example, both parties agree that a central issue on summary judgment is whether

Graham was aware that non heat treated pallets had a higher risk for insect infestations. On this

issue, McCleary stated the following at her deposition:

> Q: Do you understand the reason for heat-treating pallets?
>
> A: Yes
>
> Q: What is your understanding of that . . . .
>
> \* \* \* \* \*
>
> A: The purpose is to kill any diseases or rodents, insects, in the
> pallets.

---

[2] Graham argues that Foutz is "binding precedent" because it was decided in the Western District of Virginia. See Br. in Opp., ECF No. 25, at 16. This is simply not the case. Camreta v. Greene, 131 S. Ct. 2020, 2033 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (citing 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d], p. 134–26 (3d ed. 2011)).

Q: And is it — now, is it fair to say that that's also Graham Packaging's understanding?

A: Yes.

Q: Now, is it also fair to say that Graham Packaging understands that if you get a non heat-treated pallet, that there's a higher risk that you are going to have insects or pests inside those pallets?

A: Say that again?

Q: If the — you just said that Graham Packaging is heat treating so that it can basically, I guess, eliminate the risk of pests being inside of pallets. Is that fair?

A: Yes.

Q: Okay. So if that's why it was put in to eliminate that risk, does — did Graham Packaging understand if a pallet has not been heat-treated, it has a higher risk than a heat-treated pallet that it could have pests in it?

A: We recognize that there's a risk, yes.

Q: I mean, so at the time Graham Packaging was purchasing non heat-treated pallets, it understood that there was a risk that those pallets could have insects in them?

A: Yes.

McCleary Dep., ECF No. 30, at 138:9–139:13.

In her errata sheet, McCleary removes the references to "insects" or "pests." In their place, she states that heat treatment only "eliminate[s] the possibility of mold, fungus, or other specific contaminants that may be present in the wood at the time of the heat treatment." McCleary Errata Sheet, ECF No. 30-2, at 45:3–4, 6; 138:11–12; 139:2, 8, 13. She also withdraws her admission that Graham knew that non heat treated pallets might contain insects. Her revised testimony states that Graham expected "all pallets from Grottoes would be free of pests and ants, including non heat-treated pallets." Id. at 139:2. These proposed changes are thus not just contradictions of McCleary's prior deposition testimony, but substantive revisions of key admissions that form the

8

core of Grottoes' current motion for summary judgment. The only explanation for these changes is the notation "further investigation" beside each change.[3] See id.

McCleary's errata sheet goes further, however. A second issue raised on summary judgment is Grottoes' knowledge, if any, about the identity of Graham's customers and Graham's expectation for insect-free pallets. During her deposition, McCleary was sometimes non-responsive or stated she had no knowledge about these issues. McCleary Dep., ECF No. 30, at 133:1–137:15; 147:13–149:13. Yet McCleary did agree that Graham never told Grottoes that a specific set of pallets would be used to ship products to a particular customer. Id. at 134:13–17. McCleary also agreed that Grottoes would have "no idea" which of Graham's customers would receive any individual pallet. Id. at 134:18–24.

In her errata sheet, however, McCleary adds new testimony about the "long history" between Graham and Grottoes, and how Grottoes would "know what types of customers [Graham] shipped to" and knew specifically that "Unilever was one of [Graham's] customers." McCleary Errata Sheet, ECF No. 30-2, at 133:23; 134:12, 24; 135:5; 137:7. Moreover, McCleary states for the first time in her errata sheet that Graham expected any pallet from Grottoes—heat treated or otherwise—would be free of "pests," "insects" and "other defects." Id. at 37:19; 45:6; 139:8. The only explanation for these changes is again "further recollection" or "further investigation." Id. Similar changes are contained in Smith's errata sheet. Smith Errata Sheet, ECF No. 31-2, at 166:9.

Graham admits that its errata sheets contain substantive changes to the prior testimony of McCleary and Smith, but argues that the traditional approach to Rule 30(e) permits such changes. Grottoes, in contrast, cites the modern approach to Rule 30(e) and asks the court to ignore the

---

[3] As noted above, Graham designated McCleary as its corporate representative under Rule 30(b)(6) of the Federal Rules of Civil Procedure. A corporate designee speaks for the corporation, and a company is obliged to thoroughly prepare its Rule 30(b)(6) corporate designee to ensure that she can provide complete, knowledgeable and non-evasive answers during the deposition. See Spicer v. Universal Forest Prods., No. 7:07-CV-462, 2008 WL 4455854 (W.D. Va. Oct. 1, 2008). Graham's attempt to alter McCleary's testimony after her deposition—on issues central to Graham's potential liability in this case—is thus even more problematic.

9

errata sheets for purposes of summary judgment. Based on the briefing of both parties, the court acknowledges the current split among district courts in the Fourth Circuit on the proper scope of Rule 30(e). However, it need not explicitly adopt either the traditional or modern approach to Rule 30(e) in order to exclude Graham's errata sheets for purposes of the current motion.

In addition to the two general approaches advocated by the parties, the Third Circuit has adopted a case-by-case approach to Rule 30(e) that best addresses situations like this one, where a party submits errata sheets in close proximity to a motion for summary judgment. See EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 268 (3d Cir. 2010). This more flexible analysis allows deponents to make necessary changes via Rule 30(e) without also "generat[ing] from whole cloth a genuine issue of material fact (or eliminate[ing] the same) simply by re-tailoring sworn deposition testimony to his or her satisfaction." See EBC, Inc., 618 F.3d at 267–68. As the Third Circuit noted:

> Where proposed changes squarely contradict earlier testimony materially bearing on the case, preserving the original testimony or reopening the deposition may often prove to be insufficient remedies. Moreover, requiring trial judges in all cases to permit contradictory alterations could risk the defeat of summary judgment in a large swath of cases for which a Rule 56 disposition otherwise would be appropriate. Preservation of the original testimony for impeachment at trial serves as cold comfort to the party that should have prevailed at summary judgment. And reopening the deposition before disposition might not be a sufficient remedy, for the deponent who has reviewed his original testimony and settled on an opposite answer may prove unimpeachable.

Id. at 268. The Third Circuit analogized its approach to the "sham affidavit" doctrine, which prevents a party from avoiding summary judgment merely by submitting an affidavit that contradicts prior testimony.[4] Id. at 268–69. Using its sham affidavit precedent as a touchstone, the Third Circuit ultimately held that, in the context of summary judgment, a court has discretion to ignore

---

[4] The Seventh, Ninth, and Tenth Circuits have also referenced the sham affidavit doctrine when defining the scope of Rule 30(e). Hambleton Bros. Lumber Co. v. Balkin Enters., Inc., 397 F.3d 1217, 1225 (9th Cir. 2005); Burns v. Bd. of County Com'rs of Jackson County, 330 F.3d 1275, 1282 (10th Cir. 2003); Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000).

errata sheets that propose "substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification." Id. at 268. While the Fourth Circuit has not adopted the Third Circuit's case-by-case approach to Rule 30(e), it has recognized the sham affidavit doctrine, noting that it "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact . . . if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); see also Stevenson v. City of Seat Pleasant, Md., 743 F.3d 411, 422 (4th Cir. 2014) (applying the sham affidavit doctrine).

Mindful of this precedent, the court is persuaded that the Third Circuit's case-by-case approach to Rule 30(e) best accounts for the facts presented here. See Devon Energy Corp. v. Westacott, No. 09-CV-1689, 2011 WL 1157334, at *6 (S.D. Tex. Mar. 24, 2011) (noting that a "case-specific approach, such as that followed by the Third Circuit, is [most] consistent with Rule 30(e) . . . . "). Graham's errata sheets directly contradict the prior testimony of McCleary and Smith, and were allegedly submitted only five days before the deadline for Grottoes to file its motion for summary judgment. Graham also provides only perfunctory justifications for the contradictory changes, including that McCleary—Graham's Rule 30(b)(6) witness—did "further investigation" or had "further recollection" after giving clear, definitive answers to expected questions central to Graham's potential liability in this case. Finally, the errata sheets focus on the very issues that give rise to Grottoes' motion. In fact, many of the key facts on which Graham rests its defense to summary judgment come from Smith and McCleary's post-deposition errata sheets. For example, Graham's brief in opposition frequently cites McCleary's errata sheet to argue that Grottoes "knew" that Graham required ant-free pallets and that Graham had no direct knowledge that non heat treated pallets had a higher risk for ant infestation. See ECF No. 25, at 2, 5–6. Absent a more

11

compelling justification for the abrupt change in testimony, the court will not allow Graham to use Rule 30(e) to inject new factual disputes into the summary judgment record that did not exist previously. Instead, the court will only consider the original deposition testimony of McCleary and Smith in ruling on the current motion.

Grottoes' motion indirectly suggests that this court should strike the errata sheets for purposes of trial, but both its motion and the balance of its supporting brief only address the summary judgment record. See ECF No. 19; ECF No. 20, at 9–10. The court thus reserves judgment on any motion to strike until such a motion is squarely presented to the court. Further, as noted above, the court need not resolve the larger dispute about the proper scope of Rule 30(e) that has thus far divided courts in this circuit. In the situation presented here—where a party changes sworn testimony directly relevant to its potential liability mere days before the deadline for dispositive motions—the court is persuaded that Rule 30(e) does not allow parties to make substantive changes to deposition testimony in an effort to avoid an imminent motion for summary judgment.

**B.**

The court turns next to Grottoes' summary judgment arguments. In relevant part, Grottoes argues that Graham was aware that heat treating pallets would protect against insect infestation and that by purchasing less expensive non heat treated pallets, Graham received goods conforming to the terms of the contract. Grottoes also claims that Graham's knowledge that non heat treated pallets had a higher risk for insect infestation precludes any breach of warranty claim because the ensuing ant infestation was known, visible, or obvious to Graham. Finally, Grottoes argues that it had no knowledge that Graham had a particular purpose for its pallets and that Graham did not rely on Grottoes' skill and judgment as a pallet manufacturer when it chose to order a mix of heat treated and non heat treated pallets.

12

1.

Count I of the counterclaim asserts breach of contract. To show a breach, Graham must show that the pallets were not "in accordance with the obligations under the contract." Va. Code § 8.2-106(2).[5] To meet this burden, Graham alleges that Grottoes failed to meet "effective quality standards" and used "non-conforming raw materials" in its pallets, which led to the ant infestation. Graham Counterclaim, ECF No. 1-8, at ¶ 12. For its part, Grottoes argues that Graham ordered both heat treated and non heat treated pallets, knowing that the less expensive, non heat treated pallets had a higher risk for an ant infestation. Because Graham contracted for pallets in the face of a known risk, Grottoes believes that Graham cannot now recover damages caused by that known risk. The court disagrees, and finds that a genuine dispute of material fact precludes summary judgment on Graham's counterclaim for breach of contract.

The written contract between Grottoes and Graham consists of a series of terse purchase orders and invoices from December 2013 to April 2014. The bulk of the Graham purchase orders call for "40 x 48 wood pallets" and the corresponding Grottoes invoices describe the products the same way. A few of the Graham purchase orders specify "40 x 48 heat treated pallets" which Grottoes describes in its corresponding invoices as "40 x 48 HT Pallets." On their face, neither the Graham purchase orders nor the Grottoes invoices make any reference to contaminants in the pallets, much less mention insect infestation.

Nevertheless, contract terms "may be explained or supplemented . . . by course of performance, course of dealing or usage of trade." Va. Code § 8.2-202(a). Both course of dealing[6]

---

[5] This court's jurisdiction is based on diversity of citizenship, and Virginia law, including the Uniform Commercial Code as adopted in Virginia, controls all substantive claims.

[6] Virginia Code § 8.1A-303(a)(2)(b) defines course of dealing as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

Case 5:15-cv-00017-MFU-JCH Document 45 Filed 01/07/16 Page 13 of 26 Pageid#: 1473

and trade usage[7] are relevant here. Graham bought pallets from Grottoes for twenty years and claims it never before had any problem with an insect infestation in Grottoes' pallets. Graham also offers some evidence that the alleged insect infestation in Grottoes' pallets violated certain industry standards. Such evidence could support a finding by the jury that the contract in question called for non-infested pallets based on the course of dealing between the parties or a usage in trade. See Columbia Nitrogen Corp. v. Royster, 451 F.2d 3, 8–11 (4th Cir. 1971).

Moreover, Graham requested that some pallets receive a special heat treatment. Both parties agree that this heat treatment should prevent insect infestations. McCleary Dep., ECF No. 30, at 44:23–45:6; 138:9–139:13; James Begoon Dep., ECF No. 37, at 67:10–69:12. In fact, Grottoes' James Begoon stated specifically at his deposition that heat treatment should kill any insects or other contaminants in the wood. James Begoon Dep., ECF No. 37, at 67:10–69:12. Yet there is evidence that ants were discovered on the heat treated pallets supplied by Grottoes. For example, at least two of the loads rejected by Unilever because of ants were shipped on heat treated pallets that Graham ordered from Grottoes. McCleary Dep., ECF No. 30, at 54:24–57:5; Dean Dep., ECF No. 32, at 37:15–24. This evidence creates an additional jury question as to whether Grottoes breached any contractual obligation when it provided heat treated pallets that were allegedly infested with ants.[8]

---

[7] Virginia Code § 8.1A-303(a)(2)(c) defines usage of trade as:

> [A]ny practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as facts. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.

[8] Grottoes alleged at oral argument that cross-contamination from the non heat treated pallets explains the discovery of ants on the heat treated pallets. Grottoes claims that Graham's own expert, Dr. Marshal White, stated that ants migrated from the non heat treated pallets when Graham began replacing the non heat treated pallets with heat treated ones. White Dep., ECF No. 35, at 99:9–15; 109:22–23. However, Dr. White's testimony is not so conclusive as to warrant summary judgment. Dr. White only noted, as he must, that cross-contamination might be one possible explanation for the ants found on the heat treated pallets. Thus, while Grottoes' theory of cross-contamination is relevant for trial, it does not entitle Grottoes to summary judgment on Graham's counterclaims.

14

As such, the motion for summary judgment as to count I, alleging breach of contract, must be denied.

2.

In count II, Graham claims that Grottoes breached the implied warranty of merchantability, as defined in Virginia Code § 8.2-314, contending, in part, that ant-infested pallets would "not pass without objection in the trade" and are unfit "for the ordinary purposes for which the pallets were used." Graham Counterclaim, ECF No. 1-8, at ¶ 16. "The first phrase concerns whether a 'significant segment of the buying public' would object to buying the goods, while the second phrase concerns whether the goods are 'reasonably capable of performing their ordinary functions.'" Bayliner Marine Corp. v. Crow, 257 Va. 121, 128, 509 S.E.2d 499, 503 (1999) (quoting Federal Signal Corp. v. Safety Factors, Inc., 125 Wash. 2d 413, 886 P.2d 172, 180 (Wash. 1994)).

Grottoes argues that summary judgment is appropriate because Graham ordered non heat treated pallets knowing that such pallets were not protected from insect infestation. As such, Grottoes argues that Graham cannot recover under an implied warranty theory for a defect that was "'known, visible or obvious' to [it]." Wood v. Bass Pro Shops, Inc., 250 Va. 297, 301, 462 S.E.2d 101, 103 (1995) (citing Brockett v. Harrell Bros., 206 Va. 457, 463, 143 S.E.2d 897, 902 (1965)); Goodbar v. Whitehead Bros., 591 F. Supp. 552, 567 (W.D. Va. 1984) ("When a skilled purchaser . . . knows or reasonably should be expected to know of the dangerous propensities or characteristics of a product, no implied warranty of merchantability arises."). Put another way, Grottoes claims that the risk of insect infestation should have been open and obvious to Graham because Graham did not require Grottoes to heat treat most of the pallets it bought. The court again disagrees.

As the Fourth Circuit has noted, "[a] risk is open and obvious [under Virginia law] if the person using the product is or should be aware of the risk." Austin v. Clark Equip. Co., 48 F.3d 833, 836 (4th Cir. 1995). The question of whether a specific hazard or defect is open and obvious is

15

one of fact, and "should be left to the jury when 'the evidence [is] in conflict.'" Freeman v. Case

Corp., 118 F.3d 1011, 1014 (4th Cir. 1997) (citing Morgen Indus., Inc. v. Vaughan, 252 Va. 60, 66,

471 S.E.2d 489, 492–93 (1996)). In this case, the evidence is in conflict.

On the one hand, Graham's Rule 30(b)(6) designee testified that Graham knew that the

purpose of heat treating pallets was to "kill any diseases or rodents, insects, in the pallets," and

agreed that Graham "understood that there was a risk that those [non heat treated] pallets could

have insects in them." McCleary Dep., ECF No. 30, at 138:11–12, 139:9–13. On the other hand,

Graham states that it purchased non heat treated wood pallets from Grottoes for many years

without any reported incidence of insect infestation. Simply knowing that heat treating the pallets

could prevent insect infestation, however, does not mean that Graham knew that Grottoes' pallets

would be infested with ants. In short, there is a difference between Graham's knowledge that heat

treatment could prevent insect infestation and its knowledge that the pallets it was purchasing had

ants in them. In this circumstance, whether the defect in the pallets—the presence of ants—was

"known, visible or obvious" presents a jury question that cannot be resolved at summary judgment.[9]

Thus, the counterclaim for breach of the implied warranty of merchantability also requires

resolution by a jury.

3.

In count III, Graham alleges that Grottoes breached the implied warranty of fitness for a

particular purpose as defined in Virginia Code § 8.2-315. Graham claims that it relied on Grottoes'

skill or judgment to furnish suitable pallets for its particular purposes, and that Grottoes breached an

implied warranty when it provided ant-infested pallets that Graham used to ship empty Vaseline jars

---

[9] In addition, as stated in Part III.B.1 of this opinion, Unilever also found ants in loads shipped on heat treated pallets supplied by Grottoes. Both parties concede that heat treatment should eliminate any insect infestation in pallets. Thus, evidence of ants on Grottoes' heat treated pallets is sufficient, by itself, to create an additional jury question as to whether Grottoes supplied heat treated pallets infested with ants and, if so, whether such pallets breached the implied warranty of merchantability.

16

to Unilever. For its part, Grottoes argues that there is no evidence that it knew Graham had a particular purpose for its pallets or that Graham relied on Grottoes' skill or judgment in selecting pallets.

Under Virginia law, when a seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." Va. Code § 8.2-315. This statute embodies a long-standing, common law rule in Virginia. Layne-Atlantic Co. v. Koppers Co., 214 Va. 467, 471, 201 S.E.2d 609, 613 (1974). To show that the implied warranty of fitness for a particular purpose applies, a buyer must demonstrate that: "(1) the seller had reason to know the particular purpose for which the buyer required the goods, (2) the seller had reason to know the buyer was relying on the seller's skill or judgment to furnish appropriate goods, and (3) the buyer in fact relied upon the seller's skill or judgment." Medcom, Inc. v. C. Arthur Weaver Co., Inc., 232 Va. 80, 84–85, 348 S.E.2d 243, 246 (1986). A good's "particular purpose" as defined in the first prong "envisages a specific use by the buyer which is peculiar to the nature of his business" and must differ from a good's ordinary use in order for the implied warranty to arise. Norfolk Coating Servs., LLC v. Sherwin-Williams Co., 2:14-CV-188, 2014 WL 5860533, at *3–4 (E.D. Va. Nov. 12, 2014) (citing Va. Code Ann. § 8.2–315, cmt. 2). Moreover, the existence of any implied warranty of fitness for a particular purpose is typically a question of fact "based on the circumstances surrounding the transaction." Bayliner Marine Corp. v. Crow, 257 Va. 121, 129, 509 S.E.2d 499, 503 (1999) (citing Stones v. Sears, Roebuck & Co., 251 Neb. 560, 558 N.W.2d 540, 547 (Neb.1997)).

17

In this case, Graham claims that its twenty-year history with Grottoes put Grottoes' on notice that Graham required ant-free pallets.[10] This business relationship certainly put Grottoes on notice that Graham would use the pallets for their ordinary purpose of transporting goods. However, there is no evidence that the long-standing business relationship between Grottoes and Graham gave Grottoes reason to know that Graham had a "particular purpose" for its pallets—that is, that Graham had a "specific use" for the pallets that was "peculiar to the nature of [Graham's] business." Norfolk Coating Servs., 2014 WL 5860533, at 3–4 (citing Va. Code Ann. § 8.2–315, cmt. 2). For example, Graham's purchase orders do not reference a particular purpose or specific customer. Moreover, Bobbie McCleary, Graham's corporate designee, testified at her deposition that Graham did not tell Grottoes that pallets were for any specific customer or any specific use. On behalf of Graham, McCleary stated:

> Q: [D]id Graham Packaging ever call Grottoes Pallet and say, "Hey, I've got an order here. I need some pallets for a Unilever delivery"?
>
> A: No.
>
> Q: Is it fair to say that when they – when Graham Packaging would order the pallets, they would be delivered and set in storage, the pallet might be used for any of Graham Packaging customers?
>
> A: Yes.
>
> Q: So is it fair to say that Grottoes Pallet has no idea where its pallets are going to be going after they land on the dock at Graham Packaging. Is that correct?
>
> A: Correct.

---

[10] It is opposition brief, Graham also claims that "Grottoes [was] well aware that Graham Packaging ships packing materials to cosmetic manufacturers both domestically and internationally" and that "Grottoes also had knowledge that Unilever was Graham Packaging's customer." ECF No. 25, at 14. However, Graham cites no evidence to support this claim. The court assumes that Graham relies on the errata sheets provided by Bobbie McCleary and Jonathan Smith for these propositions. See McCleary Errata Sheet, ECF No. 30-2, at 133:23; 134:12, 24; 135:5; 137:7; Smith Errata Sheet, ECF No. 31-2, at 166:9. However, as stated in Part III.A of this opinion, the court will not allow Graham to use errata sheets submitted under Rule 30(e) to inject new factual disputes into the summary judgment record. The court will thus disregard the errata sheets when ruling on the current motion.

> Q: Did – are you aware or has Graham Packaging, to your knowledge, ever told Grottoes Pallet where any of its pallets were to be sent?
>
> A: I have no idea.
>
> * * * * *
>
> Q: And you indicated that some certain pharmaceutical customers would request heat-treated pallets. Is that correct?
>
> A: Yes.
>
> Q: Do you know if that was ever communicated to Grottoes Pallet which Graham Packaging customers were wanting the heat-treated pallets?
>
> A: No.
>
> * * * * *
>
> Q: Do you know if that was ever communicated to Grottoes Pallet by anyone at Graham Packaging that they were using pallets for shipments that were exports?
>
> A: No, I don't know.

McCleary Dep., ECF No. 30, at 134:8–21, 24, 135:2–5, 23–24, 136:1–7, 137:3–7.

Grottoes' James and Barbara Begoon testified consistently:

> Q: Do you know specifically why Graham Packaging would order some heat-treated pallets prior to this ant issue?
>
> A: I don't know that. Yeah, no, I don't know. I never asked them if it was going to a certain customer or what it was. Maybe they was sending something overseas, I don't know, you know, to China. I don't think they would've, but I – no, I never did even ask them. I never even gave it a thought really.

James Begoon Dep., ECF No. 37, at 68:8–16.

* * * * *

> Q: Did anyone from Graham Packaging ever explain to you why they wanted the heat-treated pallets?
>
> A: No. Nope.

19

Barbara Begoon Dep., ECF No. 38, at 23:16–19.

Given this testimony, there is no evidence that the business relationship between Grottoes and Graham, by itself, gave rise to a implied warranty of fitness for a particular purpose. Therefore, Grottoes is entitled to summary judgment on any portion of count III that relies only on this business relationship to create an implied warranty under Virginia Code § 8.2-315. With that said, there is some evidence that Grottoes was informed in early 2014 that Graham had a specific use for its pallets that required that no ants be present in the wood. Grottoes' James Begoon testified that he was contacted on February 10, 2014, by Brenda Hensley, an Graham employee, who told him that there were ants in the pallets and asked him to "get rid" of them. James Begoon Dep., ECF No. 37, at 54:4–56:3; 61:2–22. Begoon stated that he told Hensley that Grottoes would inspect the wood for ants. Id. at 55:8–56:3; 60:18–61:7. He also stated that Graham subsequently ordered a new load of heat treated pallets, which Grottoes then delivered to Graham. Id. at 63:5–22; see also Dean Dep., ECF No. 32, at 34:22–37:19. Graham, working with employees at the Interchange warehouse, used these new heat treated pallets to replace any non heat treated pallets currently in use. Dean Dep., ECF No. 32, at 34:22–37:19. Despite this switch, Unilever found ants on at least two subsequent loads shipped on Grottoes' heat treated pallets. Id. at 37:15–38:24; McCleary Dep., ECF No. 30, at 54:24–62:7.

Construing the facts in the light most favorable to Graham, the testimony of these various witnesses shows that Grottoes became aware sometime in 2014 that Graham had a specific use for shipping pallets that required that the pallets be free of any insect infestation. This same testimony also shows that some pallets rejected by Unilever were manufactured and delivered after Graham told Grottoes about the ant problem, and requested that future pallets be ant-free. This evidence is sufficient to create a genuine dispute as to whether Grottoes (1) had reason to know that Graham needed ant-free pallets to ship particular products to Unilever (2) had reason to know that Graham

20

was relying on Grottoes' skill and judgment as a pallet manufacturer to furnish ant-free pallets and (3) whether Graham actually relied on Grottoes' skill and judgment when ordering ant-free pallets.

The court will therefore deny Grottoes' motion for summary judgment for any portion of count III arising after Graham informed Grottoes about the ant infestation and requested that future pallets be heat treated and ant-free. The record contains sufficient evidence for a jury to conclude that an implied warranty of fitness for a particular purpose was created once Grottoes received this specific information. However, prior to the time Grottoes received such information, there is no evidence that Grottoes had reason to know that Graham had a particular purpose for the pallets, or that Graham was relying on Grottoes' skill and judgment as a pallet manufacturer.

In so ruling, the court makes no finding on whether Graham can carry its burden to show, by a preponderance of the evidence, that an implied warranty of fitness for a particular purpose existed. The evidence at trial may well show that no such warranty arose. On the record before it, however, the court cannot conclude that no reasonable juror could find for Graham on some portion of count III. Accordingly, the court will **GRANT in part** and **DENY in part** Grottoes' motion for summary judgment as to count III.

### IV.

Grottoes has also moved to exclude Dr. Marshall White, Graham's expert witness.[11] Grottoes claims that Dr. White's expert report is wholly speculative because it fails to account for the fourteen to sixteen month delay between the time Graham discarded the infested pallets outdoors and the time Dr. White inspected those pallets. Grottoes also seeks to exclude Dr. White's testimony as to whether ants were present at the time Grottoes delivered the pallets to Graham.

---

[11] Dr. Marshall White, Professor Emeritus at Virginia Polytechnic Institute and State University, has degrees in wood utilization and forest products. He is President of a consulting firm specializing in pallet, packaging, and unit load design. White. Rep., ECF. No. 22-6, at 1.

21

For the reasons stated below, the court agrees that Dr. White may not offer an expert opinion as to whether ants were present in the pallets at the time they were delivered to Graham, as his expertise in pallet, packaging, and unit load design would not be helpful to the jury in resolving this essentially factual question. However, Dr. White may testify as to the existence of insect galleries or tunnels in the pallets, his conclusion that those galleries existed at the time the pallets were constructed, and his opinion that the quantity of insect galleries violated the relevant industry standard.

Expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702"), which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case

Fed. R. Evid. 702. "Rule 702 was intended to liberalize the introduction of relevant expert evidence." Bombardiere v. Schlumberger Tech. Corp., 934 F. Supp. 2d 843, 845 (N.D.W. Va. 2013) (quoting Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)). Nevertheless, in order to be admissible under Rule 702, an expert opinion must be relevant and reliable. PBM Products, LLC v. Mead Johnson & Co., 639 F.3d 111, 123 (4th Cir. 2011) (citing Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597 (1993)). Moreover, a court must exclude any expert opinion that "is based on assumptions which are speculative and are not supported by the record." Tyger Const. Co. Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir. 1994). In assessing whether proffered expert opinion evidence is admissible, the court acts as a gatekeeper to ensure that any expert testimony satisfies the requirements of Rule 702. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001)

In this case, Dr. White inspected Grottoes' pallets on June 24, 2015, more than a year after Graham switched to a new pallet supplier and discarded Grottoes' pallets. White Rep., ECF No. 22-6, at 4. The pallets were stored outdoors for at least some portion of that time. Despite this delay, Dr. White concluded that the pallets had a high number of insect galleries in the deck boards and stringers, which he claims is evidence that some species of insect was present in the raw wood before it was sawed and assembled into pallets. Id. at 5. Dr. White also notes that acrobat ants— the ant species later observed on the pallets—are known to inhabit insect galleries created by other insects. Id. at 4. Based on these conclusions, Dr. White suggests that the galleries in the raw wood used to manufacture Grottoes' pallets were created by some unknown species of insect, and were later inhabited by acrobat ants. Id. at 5. He claims these acrobat ants were in the galleries at the time Grottoes shipped the pallets to Graham, but remained dormant because of cold temperatures at Grottoes' assembly plant, Graham's manufacturing facility, and Interchange's warehouse. Id. at 5–6. He also claims the ants became active only when they were transferred to a warmer climate near Unilever's Arkansas facility. Id. at 6.

In its motion to exclude, Grottoes first argues that Dr. White failed to account for the delay between the time Graham discarded the pallets and his inspection of the pallets. Because the pallets were exposed to the elements during this time, Grottoes claims that the insect galleries discovered by Dr. White could have been created by insects that infested the pallets after they were thrown out. In the alternative, Grottoes suggests that it eliminated any active insect infestation in the raw wood before sending the pallets to Graham. Grottoes argues that Dr. White's failure to account for these possibilities renders his opinion speculative and thus inadmissible under Rule 702. The court disagrees.

The delay in Dr. White's investigation is immaterial to his conclusion that insect galleries existed at the time the pallets were manufactured. In his deposition, Dr. White explained that he

23

found matching insect galleries on different boards in an assembled pallet, which suggests that the galleries existed in the raw wood used to create the pallet. White Dep., ECF No. 35, at 92:1–93:12; 97:24–98:23. Dr. White also found evidence that certain galleries had been sawed, which he claims is further evidence that the galleries existed at the time Grottoes manufactured the pallets. Id. at 97:24–98:23. This evidence is independent of any change caused by the delay in Dr. White's investigation, and is sufficient to admit his testimony that insect galleries existed at the time the pallets were manufactured. The fact that the pallets were discarded outside for over a year before Dr. White saw them is a matter for cross-examination.

In the same way, the delay in Dr. White's inspection does not affect his testimony about industry standards for pallet manufacturers. Dr. White claims certain industry standards require a minimum wood quality for shipping pallets. White Rep., ECF No. 22-6, at 6. In his view, the active ant infestation and large number of insect galleries in Grottoes' pallets is evidence that Grottoes failed to comply with at least one relevant standard, ISO 18333. Id. at 4–5. This testimony is within Dr. White's expertise in pallet design and manufacturing, and is based on sufficient facts to satisfy the requirements of Rule 702. To be sure, Grottoes argues that ISO 18333 governs only a pallet's structural integrity, not the presence of insects in the wood. Grottoes also claims that ISO 18333 applies only to pallets used in international shipments, not domestic shipments. These arguments, however, are subjects for cross-examination and argument at trial, and are not valid reasons to exclude Dr. White's testimony on this issue.

Nevertheless, Dr. White may not speculate in the form of an expert opinion that Grottoes' pallets were infested with ants at the time they were sold to Graham. Even Dr. White admits that acrobat ants do not create their own insect galleries, but rather inhabit galleries created by other species of insects. White Rep., ECF No. 22-6, at 4. While Dr. White's expert examination of the pallets allows him to testify that insect galleries existed in the raw wood at the time Grottoes

24

manufactured the pallets, he can only speculate that acrobat ants inhabited these galleries when Grottoes delivered the pallets to Graham. Such unfounded speculation, even by an expert witness, is inadmissible under Rule 702 of the Federal Rules of Evidence. See Tyger Const. Co. Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir. 1994). Moreover, Dr. White's expertise in pallet packaging and unit load design is not helpful to the jury in resolving the essentially factual question as to whether ants were present in the pallets at the time of sale. As such, Dr. White's testimony on this issue is not admissible. The court will thus **GRANT in part** and **DENY in part** Grottoes' motion to exclude.

## V.

For the reasons stated above, Grottoes' motion for summary judgment on Graham's counterclaims, ECF No. 19, is **DENIED** as to count I, breach of contract, and count II, breach of the implied warranty of merchantability, and **GRANTED in part** and **DENIED in part** as to count III, breach of the implied warranty of fitness for particular purpose. Grottoes' motion to exclude Graham's expert witness, ECF No. 21, is also **GRANTED** in part and **DENIED** in part. Graham's expert witness may testify as to the design and construction of wooden pallets, the relevant industry standards, and whether his pallet inspection revealed evidence of pre-construction insect infestation. Graham's expert may not testify, however, whether ants were present in the pallets at the time they were delivered to Graham. Rather, whether or not there were ants in the pallets at the time Graham accepted delivery is a factual question which a jury must decide based on the direct and circumstantial evidence presented at trial.

An appropriate Order will be entered.

Entered: 01 — 06 —2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge